UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RODRIGO RIBADENEIRA and SUPERDEPORTE PLUS PERU S.A.C., <br><br> Petitioners, <br><br> v. <br><br> NEW BALANCE ATHLETICS, INC., <br><br> Respondent. | \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \* <br> \*      Civil Action No. 21-cv-10173-ADB |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

On August 20, 2020, a single arbitrator appointed by the International Centre for Dispute Resolution issued a "Partial Final Award," resolving several tort and contract claims in favor of respondent New Balance Athletics, Inc. ("New Balance" or "Respondent") and against Petitioners Rodrigo Ribadeneira ("Ribadeneira") and Superdeporte Plus Peru S.A.C. ("Superdeporte," together with Ribadeneira, "Petitioners"). On February 11, 2021, the same arbitrator issued another award in favor of New Balance (the "Final Award," together with the Partial Final Award, the "Awards") that granted New Balance attorney's fees and statutory and contractual interest on amounts owed under the Partial Final Award.

Currently pending before the Court are: (1) Petitioners' amended petition and amended motion to vacate the Awards, [ECF Nos. 20, 21]; (2) Respondent's motion to dismiss the amended petition to vacate the Awards, [ECF No. 26]; and (3) Respondent's cross-motion to confirm the Awards, [ECF No. 27]. For the reasons set forth below, Petitioners' motion is GRANTED and Respondent's motions are DENIED.

I.    **BACKGROUND**

A.    **Factual Background**

The following facts, which are largely undisputed, are taken from the parties'

submissions and the documents cited therein.

1.    <u>The Distribution Agreements</u>

Peruvian Sporting Goods S.A.C. ("PSG") was created in late 2009, with Ribadeneira as

its majority shareholder.  [ECF No. 20 ¶ 7].  On January 1, 2013, New Balance and PSG entered

into a Distribution Agreement (the "Agreement") for the distribution of New Balance's products

in Peru.  [<u>Id.</u> ¶ 9; ECF No. 20-1].  Article 21 of the Agreement includes an arbitration clause,

which provides that

> [t]he parties agree that any and all disputes (whether in contract or any other
> theories of recovery) related to or arising out of this Agreement or the relationship,
> its application and/or termination (including post-termination obligations) shall be
> settled by final and binding arbitration in accordance with the [United Nations
> Commission on International Trade Law ("UNCITRAL")] Arbitration Rules.

[ECF No. 20-1 at 26].  The only signatories to the Agreement are New Balance and PSG through

their representatives.  [<u>Id.</u> at 28].  Neither Ribadeneira nor Superdeporte signed the Agreement.

<u>See</u> [<u>id.</u>].  The Agreement was set to expire on December 31, 2015, but a provision allowed it to

renew automatically for an additional year if no party expressed, in a writing at least sixty days

before the expiration date, an intention to let it expire.  [<u>Id.</u> at 7; ECF No. 20 ¶ 11].  Neither party

expressed such an intent, and the Agreement automatically renewed until December 31, 2016.

[ECF No. 20 ¶ 11].

Beginning in late 2014 and culminating in 2015, while the Agreement was still in effect,

New Balance offered PSG an opportunity to enter into a new and reformed distribution

agreement.  [ECF No. 20 ¶ 12].  Around that time, the relationship between PSG and New

Balance was strained because PSG allegedly owed New Balance roughly $800,000 in past due product payments and $420,000 in past due distribution fees.  [ECF No. 20-14 at 13].  New Balance requested that PSG enter into the new agreement through a distinct corporate entity.  [ECF No. 20 ¶ 12].  As a result of that request, PSG planned for Superdeporte, which at that time was a newly formed company, to eventually enter into the new distribution agreement with New Balance.  [Id.].

PSG and New Balance began negotiations for the new contract in mid-2015. [ECF No. 20 ¶ 13].  By January 2016, PSG believed that it had entered into a new agreement with New Balance and that Superdeporte would ultimately replace PSG as the signatory.  [Id.].  New Balance did not share that view, however, and on May 30, 2016, New Balance told PSG and Superdeporte that it did not think any new agreement existed and that it was "reverting back" to the Agreement.  [Id.].  Less than a month later, New Balance provided PSG and Superdeporte with written notice that it was terminating the Agreement on December 31, 2016 and had entered into an agreement with another distributor.  [Id. ¶ 14].

About a month before the Agreement was set to expire, Superdeporte and PSG assigned their rights to any claims against New Balance that arose out of the new, unsigned distribution agreement to Ribadeneira.  [ECF No. 20 ¶ 15; ECF No. 29-3].  In January 2017, Ribadeneira initiated legal proceedings against New Balance in Peru, alleging that New Balance did not fulfill its obligations under the new agreement and was liable for other extracontractual claims relating to its conduct during the negotiations of the new agreement (the "Peru Claims").  [ECF No. 20 ¶ 16].  At Ribadeneira's request, in December 2017, the Peruvian civil court entered an interim order directing New Balance to abstain from using any other company to distribute its products in Peru during the pendency of the proceedings.  [Id. ¶¶ 17–18].  The interim order was

lifted in July 2018, and New Balance was permitted to resume distribution of its products in

Peru.  [Id. ¶ 19; ECF No. 20-14 at 9].

        2.     The Underlying Arbitration

      On July 31, 2018, New Balance initiated arbitration proceedings against PSG and

Ribadeneira (but not Superdeporte), arguing that they had breached the Agreement.  [ECF No.

20 ¶ 21; ECF No. 20-2 ¶ 23].  On September 4, 2018, PSG and Ribadeneira responded to the

arbitration notice by asserting that the "arbitral tribunal lacks jurisdiction to hear any dispute

between [New Balance] and Mr. Ribadeneira or any claims which [New Balance] purports to

have in relation to Mr. Ribadeneira" because he was not a party to the Agreement.  [ECF No. 20-

3 ¶¶ 10–14].  PSG and Ribadeneira also asked the arbitrator to "[d]ismiss all [of New Balance's]

claims with respect to Mr. Ribadeneira on the ground that the arbitral tribunal lacks jurisdiction .

. . ."  [Id. ¶ 35].  About two months later, on October 29, 2018, PSG and Ribadeneira amended

their response to the arbitration notice to assert a counterclaim against New Balance, while also

maintaining that the arbitrator lacked jurisdiction over Ribadeneira and requesting that all claims

against him be dismissed.  [ECF No. 20 ¶ 23; ECF No. 20-4].

      On December 27, 2018, the arbitrator issued a procedural order recounting the

proceedings to date and the next steps.  [ECF No. 29-1].  The order explained that a

> [d]iscussion was held [in December 2018] regarding an objection to the tribunal's
> jurisdiction asserted by [Ribadeneira] on the ground that he is not a party to the
> 2013 agreement between [New Balance] and [PSG]; that agreement has not been
> assigned to him; and consequently he is not subject to that agreement's arbitration
> clause.

[Id. at 2].  The procedural order stated that Ribadeneira sought "a preliminary determination

regarding the tribunal's jurisdiction so that, if his objection to the jurisdiction prevails, he may be

relieved of the obligation to participate in the defense of the case."  [Id.].

On January 25, 2019, New Balance moved to compel the Peru Claims to be brought into the arbitration and argued that those claims were subject to the Agreement's arbitration provision.  [ECF No. 20-5 at 8].  Ribadeneira and PSG opposed the motion on jurisdictional ground and asserted that the arbitrator

> lacks jurisdiction to hear any dispute between [New Balance] and [Ribadeneira] or any claims which [New Balance] purports to have in relation to [Ribadeneira].  It must decline to exercise jurisdiction over any dispute relating to [Ribadeneira], who does not consent to arbitrate these disputes with New Balance.  It also lacks jurisdiction to hear the separate and distinct claims that [Ribadeneira] has filed against New Balance in the Peru [Claims].

[ECF No. 20-6 ¶ 18].  They ultimately asked the arbitrator to "[d]ismiss all [of New Balance's] claims with respect to Mr. Ribadeneira on the ground that the arbitral tribunal lacks jurisdiction with respect to a dispute between [New Balance] and Mr. Ribadeneira."  [Id. ¶ 33].  Despite PSG and Ribadeneira's protest, the arbitrator granted the motion to compel arbitration on March 18, 2019 and added the Peru Claims to the arbitration.  [ECF No. 20-7].  The arbitrator found that he was empowered to make a jurisdictional determination pursuant to Article 23 of the UNCITRAL Rules.[1]  [Id. at 2].

On May 2, 2019, Ribadeneira executed two assignment of rights contracts that transferred his rights to proceed against New Balance back to PSG and Superdeporte.  [ECF No. 20 ¶ 20; ECF No. 29-4].  On May 3, 2019, New Balance amended the notice of arbitration to add (1)

---

[1] Article 23 states that

> [t]he arbitral tribunal shall have the power to rule on its own jurisdiction, including any objections with respect to the existence or validity of the arbitration agreement.  For that purpose, an arbitration clause that forms part of a contract shall be treated as an agreement independent of the other terms of the contract.  A decision by the arbitral tribunal that the contract is null shall not entail automatically the invalidity of the arbitration clause.

[ECF No. 29-7 at 18].

Superdeporte as a respondent; and (2) a claim that Ribadeneira, Superdeporte, and PSG tortiously interfered with New Balance's agreement with its new distributor by seeking the interim order in the Peruvian courts.  [ECF No. 20-8 at 6, 9–11].  Ribadeneira, Superdeporte, and PSG opposed this amended notice and asked the arbitrator to declare that he lacked jurisdiction to hear all the claims with respect to Ribadeneira and the "claim regarding alleged damages suffered arising from Mr. Ribadeneira's request for interim measures in Peru."  [ECF No. 29-5 at 8].

On May 31, 2019, Ribadeneira, Superdeporte, and PSG moved for summary disposition, requesting, in part, that the arbitrator declare that he did not have jurisdiction over Ribadeneira or the tortious interference claim.  [ECF No. 20-9 ¶¶ 24–26].  The arbitrator denied the motion, reiterated that he had jurisdiction over the Peru Claims, and found that he had jurisdiction over the tortious interference claim because it arose from the Peru Claims.  [ECF No. 20-10 at 5, 12].  He deferred ruling on his jurisdiction over New Balance's claim for breach of the Agreement against Ribadeneira until further discovery into whether Ribadeneira had pierced the corporate veil.  [Id. at 12–13].

After discovery closed, Ribadeneira, Superdeporte, and PSG moved for summary disposition again, contending that the arbitrator did not have jurisdiction over Ribadeneira or Superdeporte with respect to New Balance's claims under the Agreement.  [ECF No. 20-11 ¶¶ 2–3].  Petitioners explicitly maintained their objection to the arbitrator's ruling that Ribadeneira was subject to the tribunal's jurisdiction with respect to any claim, stating that they

> respectfully continue to object to this Tribunal's ruling regarding its jurisdiction over Mr. Ribadeneira with respect to New Balance's tortious interference claim, as well as any other claim being pursued by New Balance against him, and maintain that Mr. Ribadeneira should not be a part of this proceeding. Mr. Ribadeneira continues to assert that this Tribunal has no basis to assert any jurisdiction over him, and he files this Renewed Motion under that reservation of rights and without

in any way waiving his rights or arguments in relation to this Tribunal's lack of
jurisdiction over him.  But for purposes of the Renewed Motion, [Petitioners] focus
only on the issue of whether this Tribunal has jurisdiction over Mr. Ribadeneira
and Superdeporte with respect to New Balance's claim arising under the
[Agreement].

[Id. ¶ 2 n.1].

At the arbitration hearing, Ribadeneira, Superdeporte and PSG reiterated that the

arbitrator had no jurisdiction over Ribadeneira or Superdeporte with respect to the claims arising

under the Agreement.  [ECF No. 20-12 at 2 (arguing Ribadeneira did not pierce the corporate

veil and Superdeporte was not a successor to PSG)].  In their post-hearing briefs, Ribadeneira,

Superdeporte, and PSG again argued that the arbitrator had no jurisdiction over Ribadeneira or

Superdeporte with respect to claims arising from the Agreement, [ECF No. 20-13 ¶¶ 115–39],

but the brief does not discuss jurisdiction over the tortious interference claim, see [ECF No.

20-13].

On August 20, 2020, the arbitrator issued the Partial Final Award and determined that

Superdeporte were liable for breaching the Agreement as PSG's "business successor."  [ECF No.

20-14 at 24–26].  Ribadeneira was found not liable for any breach of the Agreement because

there was insufficient evidence to demonstrate that he had pierced the corporate veil.  [Id. at

23–24].  On the tortious interference claim, the arbitrator found that Ribadeneira, Superdeporte,

and PSG all employed improper means to restrain New Balance's sales by filing the lawsuit in

the Peruvian courts.  [Id. at 23].

On September 17, 2020, Ribadeneira, Superdeporte and PSG moved for a correction and

interpretation of the Partial Final Award, and/or the issuance of an additional award, based on

their objection to the arbitrator's exercise of jurisdiction over Ribadeneira and Superdeporte.

[ECF No. 20-15 at 8–11].  The arbitrator denied the motion on November 4, 2020 and stated that

he "exercised jurisdiction with respect to Superdeporte by imposing joint liability on that company (together with PSG) for amounts owed under the 2013 distribution agreement based on [his] finding that it is the business successor to PSG," and, with regards to the tortious interference claim, he "exercised jurisdiction over Ribadeneira and Superdeporte" after concluding "that each is liable (together with PSG) . . . because the Peru [C]laims, so-called, from which that interference arose were pursued by Ribadeneira pursuant to assignments of those claims by PSG and Superdeporte."  [ECF No. 20-16 at 4].

The arbitrator issued the Final Award on February 11, 2021, which reiterated his rulings on the jurisdictional arguments and also determined that New Balance was entitled to attorney's fees, as well as statutory and contractual interests on the amount due under the Partial Final Award.  [ECF No. 20-17 at 8–9].

### B.  Procedural Background

Petitioners filed their initial petition to vacate, and corresponding motion to vacate, on February 1, 2021.  [ECF Nos. 1, 2].  After the Final Award was issued, Petitioners filed an amended petition to vacate and motion to vacate on February 22, 2021.  [ECF Nos. 20, 21].  New Balance opposed the amended motion to vacate on March 8, 2021 and filed motions to dismiss the petition and confirm the award.  [ECF Nos. 26, 27, 29].  Petitioners opposed New Balance's motions and filed their reply in support of the amended motion to vacate on April 7, 2021.  [ECF Nos. 34, 35].  On May 6, 2021, New Balance filed its reply in support of its motions to dismiss and confirm.  [ECF No. 36].

## II.  NEW BALANCE'S MOTION TO DISMISS

New Balance moves to dismiss the amended petition to vacate the Awards because the petition is untimely, under either the Federal Arbitration Act ("FAA") or the Massachusetts

Uniform Arbitration Act ("MUAA"), and consequently, Petitioners have waived any opportunity to challenge the Awards.  [ECF No. 28 at 9–14].  Petitioners counter that the FAA applies here and its ninety-day period for challenging the Awards did not begin to run until the Final Award was issued on February 11, 2021, or, at the earliest, when the arbitrator issued his order denying the motion for clarification on November 4, 2020.  [ECF No. 35 at 12–20].

### A.   Applicable Law

As a threshold matter, the parties disagree as to whether the FAA or the MUAA governs the enforcement of the award.  [ECF No. 28 at 6–7; ECF No. 35 at 7–8].  Under the MUAA, parties seeking to vacate an arbitral award must file a petition within thirty days of the award, Mass. Gen. Laws ch. 251, § 12(b), and under the FAA, parties must do so within ninety days, 9 U.S.C. § 12.

 New Balance argues that the MUAA's thirty-day limit controls here because the parties agreed that the MUAA, not the FAA, would apply to any claim arising out of the Agreement. [ECF No. 28 at 10].  New Balance points to the arbitration provision's choice-of-law clause, which states that "[t]he arbitrator shall determine the matters in dispute in accordance with the law of the Commonwealth of Massachusetts, USA."  [Id.; ECF No. 20-1 at 26].

In Hall Street Associates. v. Mattel, Inc., the Supreme Court explained that parties may contract around the FAA and "they may contemplate enforcement under state statutory or common law . . . ."  552 U.S. 576, 590 (2008).  Although the parties may contract around the FAA, "it may be displaced by state law (if at all) only if the parties have so *agreed explicitly*." Ortiz-Espinosa v. BBVA Sec. of P.R., Inc., 852 F.3d 36, 42 (1st Cir. 2017) (emphasis added). By its plain language, the arbitration provision's choice-of-law clause refers only to the law the arbitrator will apply when deciding matters in dispute and does not demonstrate that the parties

explicitly agreed to displace the FAA on matters of award enforcement and vacatur when challenges are raised in a court rather than in an arbitral tribunal.  See id. at 42 (applying the FAA when "[c]laimants have not pointed to any language in their arbitration agreement indicating that the parties intended that state law would govern vacatur of the arbitration award").  Accordingly, in the absence of an explicit agreement to displace it, the FAA and its ninety-day deadline apply here.

> **B.     Timeliness**

The parties also dispute when the ninety-day clock started to run.  New Balance argues that the petition to vacate is still untimely even if the FAA applies because it should have been filed ninety days after the Partial Final Award was issued.  [ECF No. 28 at 11–14].  Petitioners argue that the ninety days started on the date that the Final Award was issued or, in the alternative, that the clock did not start until the arbitrator issued his order denying the clarification motion.  [ECF No. 35 at 12–20].  The Court agrees that the petition was timely filed because the clock did not begin to run until the Final Award was issued on February 11, 2021.

The First Circuit has explained that

> "[n]ormally, an arbitral award is deemed 'final' provided it evidences the arbitrators' intention to resolve *all* claims submitted in the demand for arbitration." Hart Surgical, Inc. v. Ultracision, Inc., 244 F.3d 231, 233 (1st Cir. 2001) (quoting Fradella v. Patricca, 183 F.3d 17, 19 (1st Cir. 1999)).

> . . . Hart Surgical holds that a bifurcated liability judgment may qualify as final when the arbitrating parties have formally agreed to litigate liability and damages in separate, independent stages.  Providence Journal Co. v. Providence Newspaper Guild, 271 F.3d 16 (1st Cir. 2001), takes the further step of holding that an informal agreement to that effect will suffice.  These cases, in turn, are supported by the Supreme Court's position that the Federal Arbitration Act "lets parties tailor some, even many, features of arbitration by contract, including . . . procedure."  Hall Street Assocs., L.L.C. v. Mattel, Inc., 552 U.S. 576, 586 (2008).

Univ. of Notre Dame (USA) in England v. TJAC Waterloo, LLC, 861 F.3d 287, 291 (1st Cir. 2017) (some alterations in original) (some citations omitted).

Here, although the arbitrator issued two awards, there is no evidence of an informal or formal agreement between the parties to bifurcate the proceedings before the arbitrator.  The parties do not argue otherwise or point the Court to any such agreement.  See [ECF No. 35-1 (procedural order explaining how hearing and briefing will proceed with no mention of a formal agreement to bifurcate proceedings)].  Instead, the record indicates that the arbitrator decided on his own to bifurcate the proceedings by reserving certain issues for a later order and requesting additional briefing after the Partial Final Award was issued.  [ECF No. 20-14 at 26–28].  This contrasts with the facts of Providence Journal where the parties informally bifurcated the proceeding by agreeing to divide the hearing into two parts.  Providence J. Co., 271 F.3d at 20.  Thus, the Court must look to other evidence to determine when the arbitrator resolved all of the claims before him.

The Court finds that the arbitrator did not intend the Partial Final Award to represent the final disposition of all matters before him.  In the Final Award, the arbitrator unambiguously held that "[t]his award is in full settlement of all claims and counterclaims submitted to this Arbitration."  [ECF No. 20-17 at 9].  The Partial Final Award, in contrast, contains no such language, and specifically states that the arbitrator "retain[s] jurisdiction and re-open[s] the hearings for written submissions as ordered . . . ."  [ECF No. 20-14 at 28].  Matters of significant costs remained to be decided after the Partial Final Award was issued, which necessitated additional briefing.  Further, in his order on the motion for clarification and the Final Award, the arbitrator refers to the Partial Final Award as a "preliminary award."  [ECF No. 20-16 at 2–5; ECF No. 20-17 at 2].

To be sure, New Balance is correct that some facts suggest that Petitioners may have understood the Partial Final Award to be final.  [ECF No. 28 at 13–14].  Most notably,

Petitioners filed their initial petition to vacate several weeks before the Final Award was even issued and challenged only the Partial Final Award.  [ECF No. 1].  But these facts, which go to Petitioners' understanding, are not sufficient to demonstrate the arbitrator's "intention to resolve *all* claims submitted in the demand for arbitration" in light of the evidence to the contrary.  Univ. of Notre Dame (USA) in England, 861 F.3d at 291 (quoting Hart Surgical, 244 F.3d at 233).

In sum, the ninety-day deadline began to run on the day that the arbitrator issued the Final Award.  Accordingly, the amended petition to vacate was timely filed under the FAA's ninety-day deadline, and New Balance's motion to dismiss the amended petition is DENIED.

## III.    PETITIONERS' MOTION TO VACATE THE AWARDS

Petitioners move to vacate the Awards pursuant to 9 U.S.C. § 10(a)(4) because the arbitrator exceeded his powers and acted outside the scope of his authority when he determined that he had jurisdiction over them.  [ECF No. 22 at 12–13].

### A.    Standard of Review

The Court must first decide what standard of review applies to Petitioners' challenge to the arbitrator's authority.  Petitioners argue that the Court must review the arbitrator's rulings on his jurisdiction de novo, [ECF No. 22 at 13–15], while New Balance advocates for the extremely deferential review that arbitral awards are typically afforded, [ECF No. 29 at 20–27].

The Supreme Court addressed the scope of the district court's review in First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938 (1995).  In that case, First Options, a firm that cleared stock trades, and MK Investments, Inc., an investment firm, entered into an agreement that contained an arbitration clause.  Id. at 940.  After MK Investments, Inc. lost $1.5 million, First Options demanded immediate repayment of MK Investments, Inc.'s debts and insisted that Manuel Kaplan, the sole owner of MK Investments, Inc. and his wife, Carol Kaplan, personally

pay for any deficiency.  Id.  When the debt was not repaid, First Options pursued arbitration with MK Investments, Inc. and the Kaplans, even though the Kaplans had never personally signed the operative agreement.  Id. at 941.  The Kaplans filed written objections regarding their non-signatory status with the arbitration panel, but the panel determined it had jurisdiction and ruled in favor of First Options.  Id.  The Kaplans sought review in the district court and the court confirmed the award.  Id.  Eventually the case was appealed to the Supreme Court, which held, *inter alia*, that if

> the parties agree[d] to submit the arbitrability question itself to arbitration[,] . . . then the court's standard for reviewing the arbitrator's decision about *that* matter should not differ from the standard courts apply when they review any other matter that parties have agreed to arbitrate.  That is to say, the court should give considerable leeway to the arbitrator, setting aside his or her decision only in certain narrow circumstances.  *If, on the other hand, the parties did <u>not</u> agree to submit the arbitrability question itself to arbitration, then the court should decide that question just as it would decide any other question that the parties did not submit to arbitration, namely, independently.*  These two answers flow inexorably from the fact that arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration.

Id. at 943 (second emphasis added) (citations omitted); see also Oxford Health Plans LLC v. Sutter, 569 U.S. 564, 569 n.2 (2013) ("A court may therefore review an arbitrator's determination of [arbitrability] *de novo* absent 'clear[ ] and unmistakabl[e]' evidence that the parties wanted an arbitrator to resolve the dispute." (first alteration added) (quoting AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986))).  Therefore, unless there is "clear and unmistakable" evidence that the parties agreed to submit the issue of arbitrability to the arbitrator, the Court must review arbitrability independently and without deference to the arbitrator's findings.  First Options of Chicago, Inc, 514 U.S. at 943; Awuah v. Coverall N. Am., Inc., 703 F.3d 36, 41 (1st Cir. 2012).  "The clear and unmistakable evidence standard is

demanding." <u>Patton v. Johnson</u>, 915 F.3d 827, 835 (1st Cir. 2019) (internal quotation marks omitted).

Petitioners' conduct during arbitration can provide proof that they submitted the arbitrability question to the arbitrator. <u>Patton</u>, 915 F.3d at 835 ("[T]he language of the contract is not always the exclusive source of relevant information; the parties' conduct also may herald an agreement to arbitrate the question of arbitrability."). New Balance contends that Petitioners asked the arbitrator to decide the arbitrability question at least nine times, which shows "clear and unmistakable" evidence that the parties submitted the arbitrability question to the arbitrator. [ECF No. 29 at 7, 20–27]. Petitioners frame their conduct as objecting to the arbitrator's jurisdiction at essentially every stage of the arbitration rather than consenting to him deciding the issue. [ECF No. 34 at 7–11]. It is undisputed that Petitioners raised the issue of the arbitrator's jurisdiction in many of their arbitration filings. As examples, they raised it (1) in response to the arbitration notice; (2) in response to the motion to compel arbitration of the Peru Claims; (3) in both motions for summary disposition; (4) in the post-hearing briefing; and (5) in the motion for clarification. The Supreme Court made clear in <u>First Options</u>, however, that "merely arguing the arbitrability issue to an arbitrator does not indicate a clear willingness to arbitrate that issue, *i.e.,* a willingness to be effectively bound by the arbitrator's decision on that point" and that a party "forcefully objecting" to an arbitrator deciding the parties' dispute leads to the conclusion that the party "did *not* want the arbitrator[] to have binding authority over them." 514 U.S. at 946 (emphasis in original).

Like the Kaplans in <u>First Options</u>, Petitioners' continued challenges and objections to the arbitrator's jurisdiction over them shows that they did not want to be bound by the arbitrator's decision on arbitrability. Although Petitioners asked the arbitrator to make rulings on

arbitrability and to dismiss claims against them, this alone is not clear and unmistakable evidence that they intended or agreed to be bound by the arbitrator's findings on arbitrability.  At most, Petitioners' actions demonstrate ambiguity regarding their intent to have the arbitrator decide the arbitrability question, and ambiguity alone cannot meet the demanding standard.  First Options of Chicago, Inc., 514 U.S. at 944–45 ("[T]he law treats silence or ambiguity about the question *who* (primarily) should decide arbitrability differently from the way it treats silence or ambiguity about the question *whether* a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement—for in respect to this latter question the law reverses the presumption" (internal quotation marks omitted)); see also ConocoPhillips, Inc. v. Loc. 13-0555 United Steelworkers Int'l Union, 741 F.3d 627, 631–33 (5th Cir. 2014) (interpreting First Options to stand for the proposition that a party's silence and ambiguity do not demonstrate a clear willingness to have an arbitrator decide the arbitrability question). [2]

---

[2] The Court also disagrees with New Balance's contention that Superdeporte waived any challenge to the arbitrator's jurisdiction by not raising the argument below.  [ECF No. 29 at 28–29].  Superdeporte, after it was added to the arbitration in May 2019, first argued that the arbitrator had no jurisdiction over it with regards to the tortious interference claim and then, after the close of discovery but before the hearing, argued that the arbitrator had no jurisdiction to decide claims stemming from the Agreement because it was not a party to the Agreement.  New Balance fails to cite to any case law to support its proposition that a party waives its right to challenge jurisdiction when it objects to the arbitrator's jurisdiction prior to the hearing, even if that objection comes after the close of discovery.  The cases New Balance cites all involve circumstances where the arbitrability arguments were raised much later in the proceedings.  See Turner Fisheries, Inc. v. Seafood Workers Union, 471 N.E.2d 770, 772 (Mass. App. Ct. 1984) ("No objection was raised by Turner at the time of the hearing, and it was too late to raise it for the first time before the Superior Court in its application to vacate the award.");  Time Warner Cable of New York City LLC v. Int'l Bhd. of Elec. Workers, 170 F. Supp. 3d 392, 417 (E.D.N.Y. 2016) ("[The party] only challenged the arbitrator's authority after the arbitration record was closed and an unfavorable interim award had been issued against it.");  Fortune, Alsweet & Eldridge, Inc. v. Daniel, 724 F.2d 1355, 1356–57 (9th Cir. 1983) (party attended first part of the hearing and raised arguments, but then halfway through the hearing objected to arbitrator's authority);  Teamsters Loc. Union No. 764 v. J.H. Merritt & Co., 770 F.2d 40, 42 (3d Cir. 1985) ("[W]e agree with the district court that [defendant] waived its right to contest the

New Balance primarily relies on the First Circuit's opinion in Patton v. Johnson to demonstrate that Petitioners clearly and unmistakably submitted the arbitrability question to the arbitrator.  See [ECF No. 29 at 22, 26].  Patton has a complicated procedural history.  In that case, the appellant, a lawyer, sought to compel his former clients to arbitrate tort claims, including a claim for legal malpractice.  Patton, 915 F.3d at 830.  At the start of their relationship, the clients and the law firm executed an attorney representation agreement (the "ARA") that contained a three-paragraph arbitration provision.  Id. at 831.  Those three paragraphs had separate lines for the clients to initial.  Id.  Although the clients signed the ARA, they did not separately initial or otherwise acknowledge the arbitration paragraphs.  Id.  After the attorney-client relationship deteriorated, the law firm initiated arbitration against one of the clients.  Id.  The appellant-lawyer was not a party to that arbitration.  Id.  In the arbitration, the client challenged the law firm's right to arbitrate and argued that his failure to initial the arbitration paragraphs meant that they had no effect.  Id.  The arbitrator agreed that the ARA did not contain a valid and enforceable agreement to arbitrate.  Id.

After the first arbitration was resolved, the appellant-lawyer, relying on the ARA, sought to compel the same client to arbitrate with him.  Patton, 915 F.3d at 831–32.  The district court held that the lawyer was barred from compelling arbitration due to principles of collateral estoppel, which stemmed from the previous arbitrator's finding that the arbitration provision in the ARA was unenforceable.  Id. at 832.  On appeal, the appellant-lawyer argued that the first arbitrator did not have jurisdiction to decide the arbitrability issue because the parties did not

---

Board's jurisdiction in district court by failing to raise its jurisdictional objection before the Board.").

submit the arbitrability question to the arbitrator.  Id. at 834.  The First Circuit rejected this

argument because the facts showed that all of the parties to the first arbitration had submitted the

arbitrability issue to the arbitrator.  Id. at 835.  The "clear and unmistakable evidence" included

that: (1) the law firm took the "unequivocal position" that the arbitrator had the authority to

adjudicate the validity and existence of the agreement; (2) all parties had "submitted briefs to the

arbitrator on the issue of whether the claims asserted were arbitrable at all"; (3) "no one [had]

questioned the arbitrator's authority to decide that issue"; and (4) no party had moved to vacate

the arbitrator's decision.  Id. at 835.

Patton does not compel a finding that Petitioners submitted the arbitrability question

because many of the factors that the First Circuit found persuasive in that case are absent here.

While it is true that Petitioners briefed the issue of the arbitrator's jurisdiction over them, in

Patton, the law firm, who employed the appellant-lawyer, unequivocally represented that the

arbitrator had the authority to decide the arbitrability issue and there appears to have been no

dispute among the parties on that point.  There has been no such "unequivocal" concession made

in this case.  As explained previously, Petitioners' stance in the arbitration was at most

ambiguous.  Further, unlike here, none of the parties to the Patton arbitration ever moved to

vacate the arbitrator's decision.[3]

---

[3] New Balance also asserts in a footnote that the Agreement itself is the requisite clear and
unmistakable evidence because the Agreement's arbitration clause states that all proceedings will
be governed by the UNCITRAL Rules, which allow the arbitrator to decide his own jurisdiction.
[ECF No. 29 at 22 n.9].  Although the Agreement incorporates the UNCITRAL Rules, which
designate questions of arbitrability to the arbitrator, Petitioners did not sign the Agreement.  The
terms of a contract that they never signed cannot provide clear and unmistakable proof that
Petitioners agreed to arbitrate arbitrability.  See PaineWebber Inc. v. Elahi, 87 F.3d 589, 599 (1st
Cir. 1996) ("[C]ertainly a party who did not sign the agreement did not consider who should
decide arbitrability.").  New Balance cites to the First Circuit's analysis in Apollo Computer, Inc.
v. Berg, 886 F.2d 469 (1st Cir. 1989), for support, but that case determined whether a

Finally, New Balance asserts that Petitioners should have sought a stay of the arbitration or moved to vacate the jurisdictional findings before the arbitration ended.  [ECF No. 29 at 26]. Petitioners' decision to object to arbitrability, rather than to seek a stay of the arbitration, does not mean they forfeited their challenge and also does not indicate a clear and unmistakable decision to arbitrate arbitrability.  Shank/Balfour Beatty, a Joint Venture of M.L. Shank, Co., Balfour Beatty Constr. v. Int'l Bhd. Of Elec. Workers Loc. 99, 497 F.3d 83, 90 n.2 (1st Cir. 2007) ("[Plaintiff] did not waive its right to challenge arbitrability by participating in the hearing on the merits after it raised the arbitrability issues before the arbitrator and the arbitrator ruled against the company. . . .[Plaintiff] had no obligation to seek a stay of arbitration in court . . . ." (citations omitted)).

Because Petitioners did not clearly and unmistakably agree to arbitrate arbitrability, the Court must independently decide whether they were bound to arbitrate under the Agreement.

### B.    Were Petitioners Subject to the Agreement's Arbitration Clause?

New Balances argues that, even when reviewed de novo, the evidence shows that Petitioners are bound by the Agreement's arbitration clause.

First, New Balance asserts that the broadly worded arbitration clause encompasses all claims arising out of the Agreement, which includes all of the claims raised in the underlying arbitration.  [ECF No. 29 at 29–30].  As the cases cited by New Balance show, the broad language of the clause is relevant when all parties are signatories to the contract, but that is not

---

non-signatory could bind a signatory to an arbitration agreement that incorporated the American Arbitration Association's Rules.

the case here.[4]  The arbitration clause's broad scope is not sufficient to require non-signatories to participate in an arbitration absent other evidence showing that they are subject to the arbitration agreement.  Cf. Walker v. Collyer, 9 N.E.3d 854, 860 (Mass. App. Ct. 2014) (finding that a broad arbitration clause did not indicate a party's intent to be bound to an arbitration agreement when party did not "personally [sign the agreement]"); Oehme, van Sweden & Assocs., Inc. v. Maypaul Trading & Servs. Ltd., 902 F. Supp. 2d 87, 97 (D.D.C. 2012) ("A signatory to a contract has clearly and unmistakably agreed to its terms, but that is not necessarily true of a nonsignatory.").

Second, New Balance contends that Petitioners are required to abide by the arbitration clause under the theories of assumption and equitable estoppel.  [ECF No. 29 at 31].  The parties agree that the question of whether a non-signatory can be bound by the arbitration agreement is governed by Massachusetts law, and that Massachusetts law provides "six theories for binding nonsignatories to arbitration agreements: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; (5) equitable estoppel, and (6) third-party beneficiary." Machado v. System4 LLC, 28 N.E.3d 401, 408 (Mass. 2015) (footnotes omitted); [ECF No. 29 at 30–31; ECF No. 34 at 15].[5]

---

[4] Accordingly, the cases New Balance cites are inapposite because they do not involve situations where a signatory seeks to compel a non-signatory to arbitrate.  Acevedo Maldonado v. PPG Indus., Inc., 514 F.2d 614, 615 (1st Cir. 1975) (dispute stemming from a contract between two parties); Weiss v. Atholl, No. 963679, 1998 WL 1184150, at *1 (Mass. Super. Ct. Dec. 28, 1998) (arbitration clause was in an employment agreement between the two parties); Next Step Med. Co. v. Johnson & Johnson Int'l, 619 F.3d 67, 69, 72 (1st Cir. 2010) (arbitration clause was part of a business contract which, by its terms, specifically applied to all parties in the litigation); Com. v. Philip Morris Inc., 864 N.E.2d 505, 507 (Mass. 2007) (arbitration clause in settlement agreement between the parties); Carpenter v. Pomerantz, 634 N.E.2d 587, 588 (Mass. App. Ct. 1994) (arbitration clause in employment agreement between the parties).

[5] Although the parties agree that Massachusetts law applies, the parties also cite to federal cases that interpret and apply federal common law principles of contract and agency.  The theories of

"Under an 'assumption'" theory, 'a party may be bound by an arbitration clause if its subsequent conduct indicates that it is assuming the obligation to arbitrate,' despite being a nonsignatory." Machado, 28 N.E.3d at 408 n.10 (quoting Thomson-CSF, S.A. v. Am. Arb. Ass'n, 64 F.3d 773, 777 (2d Cir. 1995)). In Thomson,[6] the Second Circuit found it significant that the non-signatory "explicitly disavowed any obligations arising out of the [agreement] and filed [an] action seeking a declaration of non-liability under the [a]greement," and ultimately concluded that, under those facts, the non-signatory did not assume "the obligation to arbitrate." 64 F.3d at 777. Similar to the non-signatory in Thomson, both Ribadeneira and Superdeporte have continually objected to and challenged their participation in the arbitration and any obligations under the Agreement. Thus, Petitioners have not assumed an obligation to arbitrate.

Despite evidence of Petitioners' unwillingness to assume the arbitration obligation, New Balance argues that Superdeporte is PSG's successor and therefore assumed its obligations under the Agreement. [ECF No. 29 at 33–35]. Although New Balance has identified evidence that may indicate that Superdeporte is a successor to PSG's distribution obligations in Peru, it has not put forth evidence to counter the fact that Superdeporte has consistently tried to distance itself from the Agreement's arbitration obligations. Whether Superdeporte is PSG's successor may ultimately be relevant to Superdeporte's liability for any tort or contract claims, but, without

---

non-signatory liability under federal common law are substantially similar to those under Massachusetts law, and Massachusetts courts have relied on federal cases interpreting federal law. E.g., Walker, 9 N.E.3d at 859 ("Multiple Federal Circuit Courts of Appeals have addressed the question whether a signatory can compel a nonsignatory to arbitrate. We find these cases persuasive and adopt their approach here."). The Court has considered all of the case law cited by the parties and finds that the outcome here would be the same under either state or federal law.

[6] The Massachusetts Supreme Judicial Court relied on Thomson when outlining the six theories of non-signatory liability. Machado, 28 N.E.3d at 408 n.9–n.10, n.12.

more, it is not a basis for finding that a non-signatory is bound by an arbitration clause.  See

Machado, 28 N.E.3d at 408 (listing the six theories courts have recognized for binding

non-signatories).

New Balance argues that Ribadeneira was assigned PSG and Superdeporte's rights to

litigate under the Agreement and therefore assumed the obligation to arbitrate.  [ECF No. 29 at

32].  The plain language of the assignments, however, shows that Ribadeneira was assigned

claims related to the new and ultimately unexecuted contract, not the Agreement.[7]  New Balance

has not explained how Ribadeneira can be subject to the Agreement's arbitration provision by

virtue of being assigned rights relating to failed negotiations for a different contract.

Under the theory of equitable estoppel, a signatory can compel a non-signatory to abide

by an arbitration clause when a "nonsignatory party receiv[es] a direct benefit from an arbitration

---

[7] PSG's assignment clause states:

> During 2015 and 2016, [PSG] held negotiations with [New Balance] in order to
> celebrate a Distribution Contract to import, sell and distribute sports products in
> the territory of Peru.  However, once the contractual terms were agreed and the contract
> ready to be executed, [New Balance] informed [PSG] that it will work with another
> partner in Peru, arising a dispute between the parties. . . . [PSG] . . . transfers without
> valuable considerations to [Ribadeneira] all its rights in attention to the dispute
> mentioned before against [New Balance] . . . .

[ECF No. 29-3 at 8].  Superdeporte's assignment clause states:

> During 2016, [Superdeporte] was organized due to the negotiations that the
> founders held with [New Balance] in order to celebrate a Distribution Contract to
> import sell and distribute sports products in the territory of Peru.  However, once
> the contractual terms were agreed and the contract ready to be executed[,]  [New
> Balance] informed [Superdeporte] that it will work with another partner in Peru,
> arising a dispute between the parties. . . . [Superdeporte] . . . transfers without
> valuable considerations to [Ribadeneira] all their rights in attention to the dispute
> mentioned before against [New Balance].

[Id. at 9].

agreement." Walker, 9 N.E.3d at 861 (citing Thomson–CSF, 64 F.3d at 778); see also Ouadani v. TF Final Mile LLC, 876 F.3d 31, 38 (1st Cir. 2017) (explaining that when a signatory seeks to bind a non-signatory "estoppel has been limited to cases '[that] involve non-signatories who, during the life of the contract, have embraced the contract despite their nonsignatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract.'" (alteration in original) (quoting InterGen N.V. v. Grina, 344 F.3d 134, 146 (1st Cir. 2003))).[8]

New Balance argues that Ribadeneira is estopped from disavowing the arbitration clause because he brought suit against New Balance in Peruvian court for breach of the Agreement. [ECF No. 29 at 32–33]. Similar to its assumption argument, New Balance relies on the fact that PSG and Superdeporte assigned rights to Ribadeneira, which allowed him to bring the Peru Claims. [Id.]. But, as explained above, those assignments related to the new contract, not the Agreement, and the right to bring the Peru Claims was not a direct benefit from the Agreement.

New Balance contends that Superdeporte is estopped because it asserted a counterclaim against New Balance for breach of the Agreement and sought $10 million in damages. [ECF No. 29 at 35]. Setting aside whether raising a counterclaim in an arbitration even demonstrates that Superdeporte embraced the Agreement, only PSG, not Superdeporte sought damages for breach of the Agreement. [ECF No. 29-6 at 30–36 (explicitly referring to the counterclaim that "New Balance breached its obligations under the [Agreement] and the implied covenant of good faith and fair dealing" as "PSG's counterclaim" and arguing that PSG, not Superdeporte, suffered

---

[8] Another form of estoppel allows a non-signatory to compel a signatory to arbitrate a dispute when "(a) the nonsignatory has a close relationship with a signatory and (b) the underlying issues for arbitration are intertwined with an agreement the estopped party has actually signed." Walker, 9 N.E.3d at 861 (citing Thomson–CSF, 64 F.3d at 779). The cases establishing this form of estoppel limit its use to circumstances where a non-signatory wants to compel a signatory to arbitrate, id. at 863, and thus this theory is not available to New Balance in this case.

damages on account of that breach)].  Because the counterclaims that Superdeporte raised did not arise out of the Agreement, its decision to assert those counterclaims is not evidence of a direct benefit from the Agreement.

Because the Court finds that Petitioners are not subject to the Agreement's arbitration provision, their motion to vacate the Awards is <u>GRANTED</u>, and New Balance's cross-motion to confirm the Awards is <u>DENIED</u>.

## IV.      CONCLUSION

Accordingly, (1) Petitioners' amended motion to vacate the Awards, [ECF No. 21], is <u>GRANTED</u>, and (2) Respondent's motion to dismiss the amended petition to vacate the Awards, [ECF No. 26], and cross-motion to confirm the Awards, [ECF No. 27], are <u>DENIED</u>.


          **SO ORDERED.**

September 27, 2021                                              /s/ Allison D. Burroughs
                                                               ALLISON D. BURROUGHS
                                                               U.S. DISTRICT JUDGE